No. 76,988

In the Matter of KERRY D. HOWLETT, *Respondent.*

928 P.2d 52

Opinion filed December 6, 1996.

*Frank D. Diehl*, deputy disciplinary administrator, argued the cause, and *Mark F. Anderson*, disciplinary administrator, was with him on the formal complaint for the petitioner.

*Kerry D. Howlett*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Kerry D. Howlett, an attorney admitted to the practice of law in the State of Kansas.

The formal complaint filed against respondent consisted of four counts and alleged violations of MRPC 1.4 (1996 Kan. Ct. R. Annot. 270); MRPC 1.5 (1996 Kan. Ct. R. Annot. 276); MRPC 1.9 (1996 Kan. Ct. R. Annot. 290); MRPC 1.15 (1996 Kan. Ct. R. Annot. 302); MRPC 1.16 (1996 Kan. Ct. R. Annot. 310); MRPC 8.1 (1996 Kan. Ct. R. Annot. 348); MRPC 8.4 (1996 Kan. Ct. R. Annot. 350); and Supreme Court Rule 207 (1996 Kan. Ct. R. Annot. 205).

A formal hearing before a panel of the Kansas Board for Discipline of Attorneys was held on April 10 and 11, 1996, at the Kansas Judicial Center. Respondent appeared pro se and stipulated that he had violated MRPC 1.3 and 1.5 as set out in Counts II and III.

The facts which are the basis for the complaint against respondent are included within the panel report. No exceptions to the report were filed by respondent. The panel found as to Count I that respondent was hired by Donald and Lora Walker in several foreclosure proceedings. A decision was made to file for bankruptcy. Respondent filed the bankruptcy for the Walkers. The Walkers' complaint arises out of the subsequent dismissal of the bankruptcy proceedings by the court.

Prior to the bankruptcy being dismissed, Lora Walker referred Tamara Garrison to respondent. Mrs. Garrison was experiencing marital difficulty and was considering filing for a divorce. At the initial meeting, respondent was paid $70. Mrs. Garrison believed respondent had agreed to represent her. Respondent claimed he had obtained preliminary information from Mrs. Garrison, but advised her he might have a conflict due to prior representation of Mr. Garrison. Respondent's attempts to contact Mrs. Garrison to inform her of his conflict were unsuccessful.

As to Count I, the Walkers' complaint, the panel concluded that the evidence was conflicting and was not clear and convincing to support a finding that respondent had violated MRPC 1.4. The panel also found the evidence conflicting as to Garrison's complaint and, "in the absence of clear and convincing evidence proving the existence of an attorney-client relationship between Respondent and Tamara Garrison, the Panel cannot conclude that Respondent violated MRPC 1.16 and 1.9."

The panel found as to Count II:

"In the latter part of 1992, Mrs. Myra Hobson consulted with Respondent regarding a workmen's compensation claim. While temporarily unemployed as a result of her injuries, Mrs. Hobson was sued for past due rent and eviction. A court date was set for November 4, 1992. On November 3, 1992, Mrs. Hobson contacted Respondent by telephone and informed him of the pendency of the action and further informed him that the matter was set for hearing on the following day. Mrs. Hobson also informed Respondent that she would bring a check in the amount of $630 to his office for payment of the delinquent rent, and that it was her desire to have additional time within which to vacate the property. The check was delivered to Respondent's office, and Respondent appeared in Court on November 4, at which time the matter was continued to November 9, 1992. Respondent did not appear on November 9, 1992, and a default judgment was taken against Mrs. Hobson. Mrs. Hobson did not learn about the default judgment until it appeared on her credit report when she was denied a lease on a new apartment.

". . . The $630 paid by Mrs. Hobson to Respondent for the purpose of paying the delinquent rent was deposited to Respondent's business account, from which he paid all business operating expenses and income. It remained in such account until June, 1995, at which time the $630 was returned to Mrs. Hobson. Respondent acknowledged that at the time he received the $630 from Mrs. Hobson, he did not maintain a trust account. Respondent offered no evidence that a trust account has since been established. Respondent testified that for a substantial

period of time his office account records were unavailable to him as the result of a tax audit, thereby preventing him from locating bank records regarding Mrs. Hobson's funds.

". . . Following Mrs. Hobson's complaint to the Disciplinary Administrator's Office in May, 1994, Respondent sent a letter to the Disciplinary Administrator, Bruce Miller, dated June 3, 1994, wherein he affirmatively represented that the $630 paid by Mrs. Hobson had been forwarded to the law firm representing the landlord for payment in full of rent and late charges. He also informed the Disciplinary Administrator that he had only recently been contacted by Ms. Hobson regarding the matter, and that he had explained to her what steps he had taken to resolve her concerns. Respondent made no further written responses to the Disciplinary Administrator's Office nor to the attorney to whom the matter had been referred to for investigation, Diana Robb. Finally, in 1995, Respondent advised Diana Robb that he had just discovered that the funds delivered to him by Mrs. Hobson in 1992 had not been forwarded to the law firm representing the landlord. Other than this statement to Ms. Robb, Respondent made no further attempt to correct his previous written response to the Disciplinary Administrator."

## As to Count II, the panel concluded:

"[T]he Disciplinary Administrator has proven by clear and convincing evidence violation of Rule 1.3 which requires a lawyer to 'act with reasonable diligence and promptness in representing a client.' Respondent accepted $630.00 from Mrs. Hobson and failed to deliver and pay it to the landlord. Mrs. Hobson's money was deposited to Respondent's office account in November, 1992, and finally returned to Mrs. Hobson in March of 1995. Respondent's violation of MRPC 1.4 is also proven by clear and convincing evidence inasmuch as Respondent clearly did not communicate with Mrs. Hobson regarding the disposition of her case, the fact that a default judgment had been entered against her, and that the funds had not been disbursed per her instructions. Respondent's violation of MRPC 1.15 is also proven by clear and convincing evidence, including the admission of Respondent that Mrs. Hobson's funds were commingled with his other funds in his office account, and that he did not and does not to the current date maintain a trust account. Respondent's violation of Supreme Court Rule 207 is also proven by clear and convincing evidence inasmuch as Respondent failed to cooperate with the Disciplinary Administrator's office with regard to the investigation of the Hobson complaint. . . . Although the Panel was not particularly impressed with Respondent's candor to the Disciplinary Administrator's office, it cannot conclude based upon clear and convincing evidence that Respondent clearly and knowingly made a false statement of material fact. Therefore, it is the Panel's conclusion that Respondent's violation of MRPC 8.1 has not been proven by clear and convincing evidence."

## As to Count III, the panel found:

"Gerald Barnhardt retained the Respondent in 1992 to represent him in a matter where he was accused of unemployment compensation fraud. As part of a plea agreement, Mr. Barnhardt was to make restitution to the State of Kansas in the amount of $1,062. Mr. Barnhardt was convicted of one count of unemployment compensation fraud. Mr. Barnhardt paid $1,062 to the Respondent in order that Respondent could make restitution to the State of Kansas. He also paid Respondent $500 for his professional services. These amounts were paid over a several month period in 1992 to 1993. Mr. Barnhardt is functionally illiterate.

". . . In January, 1995, Mr. Barnhardt again applied for unemployment compensation and learned for the first time that the restitution had not been paid. Respondent admitted that the $1,062 paid by Mr. Barnhardt had been deposited to his office account rather than a trust account, and that the funds had been commingled with other funds. Respondent testified that he made attempts during 1993 and 1994 to determine to whom payments were to be made. Respondent appears to have made a good faith effort to obtain guidance from the court and the state agency as to the disposition to be made of the funds. Receiving no such guidance, he continued to have the funds in his office account.

". . . In June, 1995, Respondent returned the sum of $1,062 to Mr. Barnhardt."

. . . .

". . . With regard to the complaint of Mr. Barnhardt as set forth in Count III, Respondent's violation of MRPC 1.3 has been proven by clear and convincing evidence. . . . Respondent admits to such violation and further admits to maintaining no trust account to insure the protection of his client's funds, in violation of MRPC 1.15. The violation has been proven by clear and convincing evidence."

## The panel found as to Count IV:

"In October, 1991, Lucille Harris entered the hospital in Kansas City, Kansas, for gall bladder surgery. She claims that during the operation, her physician severed an artery to her heart. After the operation was concluded, the doctor allegedly left the hospital. Upon finding that Mrs. Harris' pulse was allegedly nearly nonexistent, the hospital staff called the doctor back to the hospital to perform a second surgery and the severed artery was apparently repaired. While recovering from the second surgery, Mrs. Harris' blood pressure and temperature were allegedly abnormally high. Finally, she claims that during a third operation, it was discovered that the gall stones had not been removed in either of the two prior surgical procedures. Mrs. Harris' medical bills were in excess of $60,000.00.

". . . The evidence is in conflict as to whether Mrs. Harris retained Respondent for the purpose of pursuing a malpractice claim or to represent her in defense to claims of the medical creditors. Mrs. Harris testified that she was referred to Respondent by an employee of a public service agency who suggested that she hire Respondent to file a medical malpractice suit against the surgeon. Mrs. Harris testified that she met with Respondent at her home on April 13, 1992, at which time she paid respondent $25.00 for expenses involved in obtaining copies of her

medical records. She further testified that on subsequent dates, she periodically mailed additional checks in the amount of $25.00 to Respondent for the purpose of obtaining medical records. She also provided Respondent with copies of all of her medical bills. Over the next two years, Mrs. Harris had several meetings with Respondent, which included visits by Respondent to her home. Mrs. Harris testified that on one occasion, Respondent advised her that he had 'filed it in court,' and that he was anxious to have the matter concluded in order that 'I can get my money and you can get yours.' . . . Upon the advice and with the assistance of her daughter-in-law, in July, 1995, Mrs. Harris consulted with an attorney in Missouri who informed her that the statute of limitations had run on the medical malpractice action. She has since discovered that most of her hospital and medical bills have been satisfied through Federal medical assistance programs. Mrs. Sarah J. W. Harris, the daughter-in-law of Lucille Harris, testified that . . . Lucille Harris had advised her that she had retained the services of Respondent for the purpose of filing a medical malpractice action to recover for her damages and injuries as a result of the alleged malpractice committed during the course of her surgery in October, 1991. Sarah Harris further testified that she became concerned about Mrs. Harris paying an attorney money for expenses when she believed that these types of cases were normally handled on a contingency fee basis. Sarah Harris testified that Lucille Harris told her in 1995 that Respondent had requested an additional $1,500.00 in order to retain the services of an expert witness. At that point, Sarah Harris began to check the records of surrounding courts to determine whether or not a lawsuit had been commenced, and discovered that no actions were pending, following which she and Mrs. Harris visited with Bryson R. Klune, an attorney in Overland Park, Kansas, who informed her that the statute of limitations had run. She further testified that she assisted Lucille Harris in acquiring her file from Respondent in April of 1995.

". . . Respondent testified that Lucille Harris contacted him to defend her against the claims of numerous creditors as a result of hospital and medical bills being incurred in excess of $60,000.00. He indicated that he met with Mrs. Harris at her residence in April, 1992. At that time, he did not get into the specifics of her medical problems. He agreed to charge Mrs. Harris $100.00 for the purpose of communicating with creditors and advising them that she was a person on a fixed income and could not pay the bills that had been incurred. He further testified that he made no representation to her that he was representing her in a malpractice claim, did not discuss a malpractice claim with her, did not submit to her a contingency fee agreement, nor did he have her sign any forms authorizing the release of medical records to him. He further testified that at no time did he have any of her medical records in his possession and had little or no experience in medical malpractice litigation. Respondent testified that had he discussed such litigation with Mrs. Harris, he would have referred the matter to an expert in the area of medical malpractice. Respondent denied requesting any additional sums from Mrs. Harris for the purpose of hiring an expert witness. Finally, Respondent testified that he never discussed the statute of limitations of a medical malpractice

action with Mrs. Harris, did not enter into a written agreement regarding the nature of his representation with her, nor terminate such relationship with Mrs. Harris by an document in writing.

". . . John Nicholas Badgerow, Chair of the Johnson County Bar Association Ethics and Grievance Committee, testified that he was involved in investigating the Harris complaint filed with the Disciplinary Administrator's office. By his letter of October 20, 1995, Badgerow contacted Respondent regarding the Harris complaint and received no written response from Respondent. Following a meeting with Lucille Harris, Mr. Badgerow again contacted Respondent by letter of November 14, 1995, following which Respondent contacted Mr. Badgerow by phone on November 16, 1995, and informed Mr. Badgerow that he would be filing a written response. No written response was received. Mr. Badgerow contacted Respondent's office by phone on more than one occasion. One time he spoke with Respondent who indicated that he had been retained by Mrs. Harris solely for the purpose of defending her against the claims of her medical creditors. Mr. Badgerow had only one telephone conversation with Respondent. At no time did Respondent file a written report or response to Mr. Badgerow's inquiry."

## The panel concluded:

"The complaint of Lucille Harris as set forth in Count IV is both . . . compelling and frustrating. Mrs. Harris was adamant in her testimony that she had, in fact, conferred with Respondent for the purpose of his representing her in a medical malpractice claim. Respondent was equally adamant in his testimony that his representation of Mrs. Harris was limited solely to that of serving as an intermediary with respect to claims of her numerous medical bill creditors. The Panel would have found Mrs. Harris's testimony to have been more credible were it not for the fact that she didn't begin to make inquiry or take action until nearly four years had lapsed since she first talked with Respondent. The Panel was incredulous that Respondent met with Mrs. Harris at her home for the purpose of discussing her sizable medical bills, continued to represent Mrs. Harris over a period of time and to meet with her from time to time, but never even discussed the nature and extent of her medical problems, the facts surrounding those medical problems, and whether or not she may have had a medical malpractice claim. Nonetheless, the testimony is clearly in conflict, and the Panel was not able to conclude upon the basis of clear and convincing evidence that Respondent agreed to represent Mrs. Harris in pursuing a medical malpractice claim. . . . In the absence of clear and convincing evidence proving the establishment of an attorney-client relationship for the purpose of pursuing a medical malpractice claim on behalf of Mrs. Harris, the Panel is not able to conclude that Respondent violated MRPC 1.3, 1.4, 1.5, 1.16 or 8.4. Respondent's violation of Supreme Court Rule 207 was proven by clear and convincing evidence inasmuch as Respondent failed to adequately respond to the inquiries of Nick Badgerow, to whom was assigned the investigation of the Harris complaint. In light of the serious allegation set forth

by Mrs. Harris in her complaint, Respondent's cavalier disregard of the investigation of the complaint is both disturbing and perplexing."

The panel unanimously recommended that respondent be suspended from the practice of law in Kansas for a period of 1 year and that the imposition of suspension be suspended and respondent be placed on supervised probation for 3 years. In making the recommendation, the panel noted that respondent appeared to be "an articulate and capable attorney" and impressed the panel with his ability "to recall numerous facts, dates and times, with little or no reference to recorded memoranda and/or documentation." In making its recommendation, the panel took into consideration the following mitigating factors:

"a. Absence of a dishonest or selfish motive. There is no evidence that Respondent used Mrs. Hobson's or Mr. Barnhardt's funds for his personal benefit and/or gain.

"b. Personal or emotional problems if such misfortunes have contributed to violation of the Model Rules of Professional Responsibility. Respondent testified that his former associate had been murdered, his sister seriously injured during the course of a domestic dispute with her husband, who subsequently committed suicide. These occurrences took place in the late 1980's and early 1990's, at such a time as could realistically be expected to have an impact upon Respondent to the extent that his performance and abilities were affected. This time is relevant to the time of the alleged ethical violations in this proceeding."

The Disciplinary Administrator's office originally recommended disbarment; however, since the panel did not find all violations as charged in the formal complaint, it recommended that respondent should be suspended for 1 year from the practice of law.

We adopt the panel's findings. Although we agree with the panel that respondent should be suspended for 1 year, we disagree that imposition of the suspension should be suspended and respondent placed on 3 years' supervised probation. We base this decision upon careful review of the record, respondent's conduct, and the nature and number of violations.

IT IS THEREFORE ORDERED that Kerry D. Howlett be and he is hereby suspended from the practice of law in Kansas for a period of 1 year from the date of this order.

IT IS THEREFORE ORDERED that respondent shall comply with the provisions of Supreme Court Rule 218(a) (1996 Kan. Ct. R. Annot. 226) and, at the end of the 1-year suspension, respondent will be reinstated upon furnishing proof of compliance thereof to the Clerk of the Appellate Courts.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this order be published in the official Kansas Reports.